In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3929

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ABRAHAM COLON,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois Eastern division.
No. 06 CR 819—**Virginia M. Kendall**, *Judge*.

ARGUED NOVEMBER 4, 2008—DECIDED DECEMBER 8, 2008

Before POSNER, WOOD, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant was convicted by a jury of possessing cocaine with intent to sell it, conspiring to possess cocaine with intent to sell it, and aiding and abetting the conspiracy, and he was sentenced to 135 months in prison. The principal ground of his appeal is that he was not a conspirator or an aider and abettor of a conspiracy, but was merely a purchaser from a conspiracy,

and that the jury's contrary finding lacked sufficient basis in the evidence to stand. He also challenges on Fourth Amendment grounds his conviction of possession, and we start there.

The government was listening to the phone conversations of the defendant's supplier, Saucedo, and heard him tell Rodriguez (Saucedo's admitted co-conspirator) that "Dude" would be coming to a particular house in 15 minutes to pick up drugs that "Dude" had ordered. Sure enough, 15 minutes later, officers staking out the house saw a man enter it and emerge shortly afterwards, and they tried to stop him and after a chase caught him and found the cocaine he had just bought. The man was Colon. The cocaine was introduced into evidence against him at the trial. He argues that merely knowing that a house is one in which drugs are sold doesn't create probable cause to stop everyone who enters it. That is true in general, *Ybarra v. Illinois*, 444 U.S. 85, 94-96 (1979); *United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999); cf. *United States v. Mitchell*, 783 F.2d 971 (10th Cir. 1986), but the police had reason to believe that the man who entered the house was indeed the expected buyer. He arrived when Saucedo told Rodriguez the buyer would arrive, and during the preceding 15 minutes no one else had entered the house from the street (some persons had entered from the porch of the house). So it was more than suspicion or a guess that the man the police seized was a buyer, and so the defendant's challenge to his conviction of possession fails.

His challenge to his conviction of conspiracy and of aiding and abetting a conspiracy has far more substance. The

evidence of his guilt of these offenses, as summarized in the government's brief, is that the "defendant regularly obtained distribution quantities of cocaine from Saucedo and Rodriguez. . . . The dealings between . . . [the defendant and Saucedo, with whom alone the defendant dealt] were standardized and exhibited mutual trust. Saucedo and Rodriguez had a stake in defendant's distribution activities as well as their ongoing arrangement, given that their profits depended on the success of defendant's distribution efforts. . . . [The defendant and Saucedo] conducted regular, standardized transactions through which defendant obtained cocaine in quantities of either 4.5 or 9 ounces at consistent prices, and distributed it to customers. Defendant and Saucedo regularly arranged deliveries by telephone," with defendant being the caller, using Saucedo's cellphone number.

The government's summary describes a routine buyer-seller relationship, as in *United States v. Mercer*, 165 F.3d 1331, 1336 (11th Cir. 1999), where the court remarked that "the evidence shows simply that his co-defendant Miller knew that Mercer sold drugs and that he had sources from which he could get drugs, that Mercer had a source for drugs and if that source failed he would 'go somewhere else,' that he bought quantities of cocaine from some unknown source and sold it to police agents presumably at a profit." The relationship in the present case was "standardized" only in the sense that because seller and buyer dealt regularly with each other, the sales formed a regular pattern, as one would expect in any repeat purchase, legal or illegal. The length of the sales relationship is unclear; it may have been as long as six weeks, but the

total number of sales was no more than six or seven, involving a total of 30 to 35 ounces of cocaine.

In any event, how "regular" purchases on "standard" terms can transform a customer into a co-conspirator mystifies us. "[A]greement—the crime of conspiracy—cannot be equated with repeated transactions." *United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998). The government either is confusing buying with conspiring or believes that a seller and buyer who fail to wrangle over each sale aren't dealing at arms' length and therefore lack mutual trust. But "mutual trust" is already a factor in the conventional analysis of conspiracy; an act that is merely evidence of mutual trust cannot be a separate factor. And anyway repeat transactions need not imply greater mutual trust than is required in any buyer-seller relationship. If you buy from Wal-Mart your transactions will be highly regular and utterly standardized, but there will be no mutual trust suggestive of a relationship other than that of buyer and seller.

It is different if, as in *United States. v. Sax*, 39 F.3d 1380, 1385-86 (7th Cir. 1994), a seller assists his customers in establishing the methods by which they will take delivery from him, for then he is more than just a seller; he is helping to create a distribution system for his illegal product. But the defendant in our case (a buyer, not a seller) did nothing to help Saucedo and Rodriguez establish a delivery system that would enable them to serve him, or serve him better.

The fact that in his conversations with Rodriguez, Saucedo referred to Colon as "Dude" or "Old Boy," rather than calling him by his name, is not, as the government

believes, indicative of intimacy or a pre-existing relation-ship; it is for obvious reasons a convention in the drug trade not to refer to a customer by his real name. There were no sales on credit to the defendant, or other evidence of mutual trust or dependence, and he had no dealings with—indeed, he never met or spoke to—Rodriguez, Saucedo's unquestioned co-conspirator, although the defendant knew that they worked together. There is no suggestion that the defendant could expect to receive any part of the income that Saucedo obtained from selling cocaine to other customers. There was no "stimulation, instigation," or "encouragement" by the defendant of Saucedo and Rodriguez's business, *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943), no "informed and interested cooperation" between that business and the defendant's retail drug business. *Id*. In his conversations with Rodri-guez, Saucedo referred to the defendant only as a "cus-tomer," not as an associate, colleague, pal, or "one of us." The prosecutor in closing argument described the defendant as the conspirators' customer, and its own witnesses denied that Saucedo had ever asked the defendant to sell cocaine for him or Rodriguez.

Of course Saucedo and Rodriguez had, as the government says, "a stake in defendant's distribution activities." Every seller to a distributor has a stake in the distributor's activi-ties; a person who buys for resale will not enrich his seller if his resale business dries up. Saucedo and Rodriguez had other customers; we do not know how many, or what the defendant's volume of purchases was relative to that of other customers.

Cases in this and other circuits list factors such as we have discussed, along with others, as indicative of participation in a conspiracy. But in every case such factors have to be placed in context before an inference of participation in a conspiracy can be drawn. See *United States v. Moran,* 984 F.2d 1299, 1302-03 (1st Cir. 1993). In *United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004), for example, we listed a number of these factors but added "prolonged cooperation" between the parties (a quotation from *Direct Sales Co. v. United States*, *supra*, 319 U.S. at 713, the Supreme Court's leading case on the difference between a conspiracy and a mere buyer-seller relationship) and "sales on credit," factors that strengthen an inference of participation drawn from observing circumstances also found in a routine buyer-seller relationship. See also *United States v. Hawkins*, 2008 WL 4589396, at *7 (2d Cir. Oct. 16, 2008).

So the government's theory of conspiracy, when stripped of its redundancies and irrelevancies, reduces to an assertion that a wholesale customer of a conspiracy is a co-conspirator per se. The implication is that during Prohibition a speakeasy was a co-conspirator of the smuggler who provided it with its supply of booze. And the logic of the government's position does not stop with the customer who is a wholesale purchaser rather than a retail one. Had the defendant been purchasing for his personal consumption, he would still have had "regular, standardized" transactions with Saucedo, as in our Wal-Mart example, and Saucedo would have had a stake in whatever activity the defendant engaged in to obtain the money to buy cocaine. There would have been the same level of "mutual trust" as required in any illegal sale because either buyer or seller

might be a government informant or turn violent. The mutual trust in this case was less than it would have been had Saucedo "fronted" cocaine to the defendant (a factor mentioned in almost all the cases) rather than being paid in cash at the time of sale. With fronting, the seller becomes the buyer's creditor, adding a dimension to the relationship that goes beyond a spot sale for cash.

There are practical reasons for not conflating sale with conspiracy. "A sale, by definition, requires two parties; their combination for that limited purpose does not increase the likelihood that the sale will take place, so conspiracy liability would be inappropriate." *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991) (citation omitted). As we put it in *United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir. 1986), "A conspiracy involves more people and can therefore commit more crimes; and it can do so more efficiently, by exploiting the division of labor and by arranging concealment more effectively—sometimes through suborning law enforcers." There is nothing like that here, so far as the defendant's involvement was concerned. And the situation is not altered just because he was a buyer for resale rather than for his personal consumption. As the plurality opinion in *United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993) (en banc), explains, "before today, it was widely assumed that a conviction for participation in a drug conspiracy could be affirmed with no more evidence than that the defendant had sold in a quantity too large to be intended for his buyer's personal consumption, though some of our cases . . . tugged the other way. Today we resolve the conflict in our cases by holding that 'large quantities of controlled substances, without more, cannot

sustain a conspiracy conviction.' What is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself." *Id*. at 347 (citations omitted). (This part of the *Lechuga* opinion reflected the view of the majority of the judges, as noted in *United States v. Dekle*, 165 F.3d 826, 829 n. 3 (11th Cir. 1999).) See also *United States v. Thomas*, 284 F.3d 746, 750 (7th Cir. 2002); *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001); *United States v. Wexler*, 522 F.3d 194, 207-08 (2d Cir. 2008).

The Eleventh Circuit pointed out in *United States v. Dekle*, *supra*, 165 F.3d at 829, that "what distinguishes a conspiracy from its substantive predicate offense is not just the presence of any agreement, but an agreement with the same joint criminal objective—here the joint objective of distributing drugs. This joint objective is missing where the conspiracy is based simply on an agreement between a buyer and a seller for the sale of drugs. Although the parties to the sales agreement may both agree to commit a crime, they do not have the joint criminal objective of distributing drugs." This would be a different case, therefore, had the defendant agreed to look for other customers for Saucedo and Rodriguez, had received a commission on sales to those customers, had advised Saucedo and Rodriguez on the conduct of their business, or had agreed to warn them of threats to their business from competing dealers or from law-enforcement authorities. It would be a different case if "Lechuga [the seller] had told Pinto [the buyer] that he needed a good distributor on the south side of Chicago and wanted to enter into a long-term relationship with Pinto to that end. Then it would be as if Lechuga had hired Pinto to assist him in

reaching his market." *United States v. Lechuga, supra*, 994 F.2d at 349.

All these would be settings in which, in the Eleventh Circuit's terminology, Saucedo, Rodriguez, and the defendant would have had "the same joint criminal objective . . . of distributing drugs." 165 F.3d at 829; see, e.g., *United States v. James*, 540 F.3d 702, 707 (7th Cir. 2008); *United States v. Jarrett*, 133 F.3d 519, 533-34 (7th Cir. 1998); *United States v. Romero*, 57 F.3d 565, 569-70 (7th Cir. 1995); *United States v. Garcia*, 45 F.3d 196, 198-99 (7th Cir. 1995); *United States v. Brown*, 217 F.3d 247, 254-55 (5th Cir. 2000), vacated on unrelated grounds under the name *Rendle v. United States*, 531 U.S. 1136 (2001); *United States v. McCoy*, 86 F.3d 139, 140-41 (8th Cir. 1996); *United States v. Reynolds*, 828 F.2d 46, 47 (1st Cir. 1987); *United States v. Pozos*, 697 F.2d 1238, 1241 (5th Cir. 1983). But in our case there is no evidence of a relationship other than a conventional sales relationship between the defendant and the conspiracy from which he bought drugs. It is true that after discarding, in his flight from the police, the cocaine he had just bought from Saucedo, the defendant called Saucedo and told him what had happened. But there is no suggestion that he was warning Saucedo, in order to help the latter evade capture, rather than merely reporting an incident that might affect the defendant's future purchases. A drug runner employed by Saucedo phoned the defendant and told him he'd been stopped by the police after delivering cocaine to him, but that is not evidence of the defendant's participation in a conspiracy either.

The muddle that was the government's theory of the case was mirrored in the jury instructions, which after correctly

noting that the defendant's purchase of drugs from another person for resale was insufficient evidence that the defendant had conspired with that person, told the jury to consider whether "the parties had an understanding that the cocaine would be sold" and whether "the transaction involved large quantities of cocaine." If the defendant was a middleman, as he was, the parties would understand that he would be reselling the cocaine; and as a middleman he would be likely to buy in quantities greater than one would buy for one's personal consumption, and therefore "large." The jury was also asked to consider whether the parties had "a standardized way of doing business over time," whether they had "a continuing relationship," "whether the sales were on credit or on consignment," and whether the seller had a "financial steak [*sic*] in a resale by the buyer." Only the question about credit or consignment was germane, for reasons that we've indicated, and that question could only have confused the jury, since all the transactions with the defendant were cash transactions. And the judge made no effort to relate the factors that she told the jury to consider to the difference between a customer and a conspirator. It is no surprise that the jury convicted; given the warped instructions, the conviction does nothing to advance the government's argument that the evidence of conspiracy was sufficient for a reasonable jury to convict.

Nor was the defendant proved to be an aider or abettor of the Saucedo-Rodriguez conspiracy. An aider and abettor is conventionally defined as one who knowingly assists an illegal activity, wanting it to succeed. E.g., *United States v. Pino-Perez*, 870 F.2d 1230, 1235 (7th Cir. 1989) (en banc); *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005); *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L.

Hand, J.). This is a general definition, however, and like most legal generalizations requires qualification in particular cases. Suppose you own and operate a store that sells women's clothing. Every month the same young woman buys a red dress from your store. You happen to know that she's a prostitute and wears the dress to signal her occupation to prospective customers. By selling her the dress at your normal price you assist her illegal activity, and probably you want the activity to succeed since if it fails she'll stop buying the dress and your income will be less. But you are not an aider and abettor of prostitution because if you refused to sell to her she would buy her red dress from another clothing store, one whose proprietor and staff didn't know her profession. *United States v. Zafiro*, 945 F.2d 881, 887 (7th Cir. 1991), affirmed on other grounds, 506 U.S. 534 (1993); see also *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir. 1940) (L. Hand, J.). So you're not *really* helping her or promoting prostitution, as you would be if you recommended customers to her in exchange for a commission.

It is the same here, so far as the record reveals. By buying from Saucedo, the defendant was assisting an illegal activity, which he doubtless wanted to be successful as otherwise he would have to find another seller. If that is enough to establish aiding and abetting, every buyer from a drug conspiracy is an aider and abettor of a conspiracy and is therefore to be treated by the law exactly as a member of the conspiracy would be treated. 18 U.S.C. § 2(a). Yet as with the sale of the red dress, there is no basis for thinking that the defendant really helped Saucedo and Rodriguez's drug conspiracy—that he made a differ-

ence—because so far as appears they could have found another customer for the modest amount of cocaine that they sold to him.

The government relies on *United States v. Kasvin*, 757 F.2d 887 (7th Cir. 1985), but omits mention of the part of the opinion that shows how different that case is from this one. Kasvin, the buyer defendant, "for several years . . . had visited the headquarters of the conspiracy several times weekly, had been assigned a number just as some of the admitted members of the conspiracy had been assigned, his telephone number had been encoded, on occasion he provided the organization with marijuana for use in its business, his transactions with the conspiracy ran into hundreds of thousands of dollars annually but unlike an ordinary customer of a business, he simply picked up quantities of marijuana from headquarters, presumably disposed of it through a distribution network, and brought the money back from time to time in amounts which, so far as the records show, bore no definite relationship to the amounts of marijuana carried away at any particular time." *Id*. at 891. There is nothing like that here.

We are mindful of cases such as *United States v. Abuelhawa*, 523 F.3d 415, 419-21 (4th Cir.), cert. granted, 2008 WL 3849383 (U.S. Nov. 14, 2008), and our own *United States v. Binkley*, 903 F.2d 1130, 1135-36 (7th Cir. 1990), which hold (contrary to the decisions of some other circuits, however) that 21 U.S.C. § 843(b), which makes it unlawful "for any person knowingly or intentionally to use any communication facility in . . . facilitating the commission of any act or acts constituting a felony" in violation of the Controlled

Substances Act, 21 U.S.C. §§ 801 *et seq.*, is violated when a person uses the phone to order drugs for his personal use. But these decisions are based on the specific language of section 843(b) rather than on the concept of aiding and abetting.

Even the government has its doubts whether the defendant was a member or an aider and abettor of the Saucedo-Rodriguez conspiracy. A conspirator is liable for the foreseeable crimes that his co-conspirators commit in furtherance of the conspiracy, *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *United States v. Hach*, 162 F.3d 937, 951 (7th Cir. 1998), yet the only drug quantity on which the government sought to base the defendant's sentence was the quantity that Saucedo sold him, though he knew that Saucedo and Rodriguez were selling cocaine to others as well as to him. One is led to wonder why the government added charges of conspiracy and of aiding and abetting to the charge of possession with intent to distribute. The guideline ranges were the same and the additional charges were likely to confuse the jury by making the defendant's conduct seem more ominous than it was. Those charges were not necessary to enable the government to introduce an alleged co-conspirator's (Saucedo's) evidence against the defendant, since when the question is the admissibility of such evidence the judge decides, in ruling on its admissibility, whether there was a conspiracy. *United States v. Yoon*, 128 F.3d 515, 525-26 (7th Cir. 1997); *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978), overruled on other grounds by *Bourjaily v. United States*, 483 U.S. 171 (1981). There needn't be a *charge* of conspiracy.

So probably the additional charges added nothing to the charge of possession with intent to distribute. But maybe the government was concerned that in the (unlikely) event that the evidence obtained when the defendant was caught at Saucedo's house was suppressed, the jury might acquit the defendant of possession or the sentence for possession might be based on a smaller quantity of cocaine and therefore be shorter.

Since the defendant was given concurrent sentences on the two counts, it may seem that reversing the conspiracy and aiding and abetting count could not alter his sentence. But the district judge sentenced him very near the top of the applicable guideline range, and in doing so may have been influenced by the fact that the jury had found the defendant guilty of conspiracy and aiding and abetting as well as of possession. *Yates v. United States*, 355 U.S. 66, 75-76 (1957); *United States v. Manzella*, *supra*, 791 F.2d at 1270; *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 171-72 (2d Cir. 2008). So while the defendant's conviction of possession stands, he is entitled to be acquitted on the other count and he must therefore be resentenced.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED WITH DIRECTIONS.