In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2371

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MILES MUSGRAVES,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:13-CR-30276-MJR — **Michael J. Reagan**, *Chief Judge.*

ARGUED FEBRUARY 24, 2016 — DECIDED JULY 27, 2016

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In 2015, defendant Miles Musgraves was convicted of five crimes stemming from his life as a drug dealer-turned-informant. His appeal challenges the search warrant for his apartment, the sufficiency of evidence on three of his convictions, and his sentence as a career offender. We affirm in part and reverse in part.

In Part I, we affirm the denial of Musgraves's motion to suppress evidence seized based on the search warrant. In Part II, we reverse for insufficient evidence three of Musgraves's convictions, for conspiracy to distribute cocaine, possession of a firearm as a felon, and distribution of cocaine near a school. In Part III, we affirm the district court's finding that Musgraves qualifies as a career offender under the Sentencing Guidelines. Accordingly, we affirm two of Musgraves's convictions, reverse three convictions, vacate his sentence, and remand for resentencing on the two remaining convictions.

I.  *The Warrant to Search Musgraves's Home*

Starting from an informant's tip in 2012, the police in Alton, Illinois, investigated Musgraves for suspected drug dealing. The matter was not urgent, but the police eventually obtained a warrant to search Musgraves's home in July 2013. The search revealed ammunition, which Musgraves could not possess legally because of a prior felony conviction. Musgraves argues there was no probable cause to support a search warrant. The police and state court procedures were sloppy, but in the end we find no error and affirm the denial of the motion to suppress.

   A.  *Factual Background*

      1.  *Confidential Informant Tisdale*

On August 14, 2012, Sergeant William Brantley and Detective Kurtis McCray of the Alton Illinois Police Department received a tip from a confidential informant named Thomas Tisdale. He told Brantley and McCray that he could buy cocaine from a seller who lived in town. The officers agreed to have Tisdale make a controlled buy from the seller, known as "L" and later identified as defendant Miles "Lou" Musgraves. In

the presence of the officers, Tisdale called to arrange to buy $100 worth of crack cocaine at Musgraves's home. The officers provided Tisdale with money, placed hidden video recorders on him, and followed as he drove to the buy site.

The deal did not run smoothly. Tisdale entered the house and returned to his car ten minutes later, but he was out of gas. A woman came out of the house and agreed to drive Tisdale to a nearby gas station. He filled up a container with gas, returned to the house, refueled his car, and only then drove back to the police station. Tisdale gave the officers a plastic bag containing what appeared to be crack cocaine. The video recording showed Tisdale handing $100 to Musgraves in exchange for a bag of white powder similar to the bag Tisdale had given the police.

More than a month later, on September 21, Tisdale contacted Musgraves to make a second controlled buy. Things quickly fell apart. When Tisdale arrived at Musgraves's house, he spoke with Musgraves and his half-brother, Romell Stevens. Stevens accused Tisdale of cooperating with police. He sternly told Tisdale that neither he nor Musgraves sold drugs and that Tisdale had better leave. Back at the police station, Tisdale received a call from Stevens again accusing him of being an informant, and then a second call from Musgraves trying to make peace with him. The investigation of Musgraves stalled, at least for a while.

2. *Boner's Identification of Musgraves*

By 2013, the Alton police had shifted their attention to Stevens. He had been released from prison in 2012 with a long criminal record that included felony drug distribution and possession of a firearm. Stevens moved into the home of Mark

Gordon, where he began selling cocaine almost immediately. When Stevens' drug supply would run low, he would drive to Musgraves's house, buy cocaine from Musgraves, and then return to complete the sale to his own customers.

When Stevens' customers could not afford the cocaine, they would sometimes put up firearms as collateral. A few of those transactions are relevant to the case against Musgraves. One customer, Donald Bock, twice traded firearms for drugs with Stevens in early 2013. Bock once pawned an Arsenal 7.62 millimeter rifle (similar to an AK-47) to Stevens in exchange for a gram or two of crack cocaine. Another time, Bock proposed using his H&K .40 caliber handgun as collateral. Stevens in turn asked Musgraves if he was interested in the gun as payment for crack cocaine. Bock drove Stevens to Musgraves's house, where he saw Stevens enter the house with the gun and return with crack cocaine. Stevens would later testify that he had left both the rifle and handgun with Musgraves, who nonetheless "didn't want them there, so he said he was going to get them out of there." Bock later tried to pay back his debt and retrieve the guns, but Stevens did not produce them. In a startling display of chutzpah, Bock called the sheriff's department to report the guns stolen—falsely describing them as having been "stolen out of my vehicle"—and provided their serial numbers.

In 2013, Stevens moved to the home of Kenneth Boner and his mother. Stevens resumed selling both crack and powder cocaine in exchange for cash, pills, and guns. At the same time, Boner—17 years old in 2013—and his mother illegally sold prescription medication out of their home. This arrangement did not last long. The chief of police happened to live across the street from the Boners, and he saw that Stevens'

drug-addicted customers were often around the home. Stevens was arrested on July 9, 2013.

The police interviewed Boner as part of the Stevens investigation. Boner identified a photograph of Musgraves as the source of Stevens' drug supply. Boner told officers that Musgraves had driven over to the house. Stevens got in Musgraves's car briefly and then emerged with cocaine for sale. Boner also led officers to Musgraves's home to confirm his identity.

### 3. *The Search Warrant*

On July 10, 2013, the police sought a search warrant for Musgraves's house, supported by two affidavits. Sergeant Brantley's affidavit detailed the August 2012 controlled buy from Musgraves but said nothing about the problems with the buy. The affidavit did not identify Tisdale but referred to him only as "confidential informant 12-16" and provided no further information about his background, credibility, or criminal history.

The second affidavit was from Kenneth Boner, identified only as "John Doe." Boner said that he had seen "Stevens' brother" provide Stevens powder cocaine in exchange for $100, that he had seen Stevens enter his brother's home with Vicodin and emerge with cocaine, that he had identified a photograph of Musgraves as Stevens' brother, and that he had escorted Sergeant Brantley and Detective McCray to Musgraves's house. No information was provided about Boner's background, credibility, or criminal history.

Both Sergeant Brantley and Boner appeared before a state court judge to secure the search warrant. The judge asked

only that Brantley and Boner swear the information in the affidavits was correct to their knowledge. Boner was not asked to reveal his real name or background. As Sergeant Brantley would later testify, this was not unusual. In his experience, no judge in the county had ever asked him to provide any information impeaching the credibility of an affiant or to put that information in his search warrant requests.

The judge issued the warrant to search for controlled substances, weapons, drug paraphernalia, and instruments and records of drug sales. On July 12, 2013, police searched Musgraves's house. The search turned up three boxes of 9 mm ammunition, money, and Musgraves's personal identification, though it produced no concrete evidence of drug activity and no firearms. As a convicted felon, Musgraves was prohibited from possessing ammunition. See 18 U.S.C. § 922(g)(1). We pause here in recounting the facts to consider the legality of the search.

B. *Analysis*

Musgraves was later indicted on several federal charges and moved to suppress the evidence of the July 2013 search, including the ammunition, currency, and identification documents, as well as all post-arrest statements. The district court denied the motion. On appeal from the denial of a motion to suppress, we review conclusions of law *de novo* and findings of fact for clear error. *United States v. Glover*, 755 F.3d 811, 815 (7th Cir. 2014), citing *United States v. McGee*, 280 F.3d 803, 805 (7th Cir. 2002).

A judge's decision to issue a search warrant must be supported by probable cause, established with facts that make it

likely that contraband or evidence will be found in a particular place. *United States v. Mullins*, 803 F.3d 858, 861 (7th Cir. 2015), citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Reviewing courts give great deference to an issuing judge's probable cause determination. *Gates*, 462 U.S. at 236; *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008).

When a defendant challenges probable cause for a search warrant based on an informant's report, we consider the totality of the circumstances, focusing on five non-exclusive factors: (1) "the level of detail," (2) "the extent of firsthand observation," (3) "the degree of corroboration," (4) "the time between the events reported and the warrant application," and (5) "whether the informant appeared or testified before the magistrate." *Glover*, 755 F.3d at 816, citing *United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011). While no one factor is dispositive and the inquiry is highly fact-specific, we have emphasized that "information about the informant's credibility or potential bias is crucial." *Glover*, 755 F.3d at 816.

When the police omit "known, highly relevant, and damaging information about [an informant's] credibility," and particularly his criminal record, prior deception of law enforcement, and expectation of payment, the problem is serious. *Id.* at 817. Without such information, a judge lacks the opportunity to assess the reliability of the information relied upon to authorize a highly intrusive search. See *id.* at 818. Omission of credibility information is not necessarily fatal, though, because "a strong showing on the primary factors can salvage the warrant." *Id.*, citing *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006). The affidavits submitted to obtain this search warrant did not include any information about the

credibility of the two informants, and the judge who issued the warrant apparently did nothing to test their credibility.

Sergeant Brantley's affidavit about Tisdale's clumsy efforts to buy drugs from Musgraves in 2012 did not provide probable cause for the search warrant in July 2013. By omitting Tisdale's name and details of his extensive criminal history, Brantley did not provide the judge "with even a minimum of information on credibility that might have triggered further inquiry." *Glover*, 755 F.3d at 818. No other factors resuscitate the Tisdale information. Sergeant Brantley failed to mention the irregularities in the first, poorly controlled buy. Moreover, eleven months had passed between that buy and the warrant request. That information was simply too stale to justify a search for drugs and related items. See *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012) ("'Staleness' is highly relevant to the legality of a search for a perishable or consumable object, like cocaine … ."); *United States v. Pappas*, 592 F.3d 799, 803 (7th Cir. 2010) (noting "the recency of information contained in a search warrant application is one factor bearing on the question of probable cause"). Also, Tisdale did not appear before the judge in 2013. See *United States v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014) (noting significance of informant appearing in person before issuing judge). This was not the "strong showing" we require for cases where credibility information was omitted. *Glover*, 755 F.3d at 818.

The Boner affidavit, however, rescues the search warrant, keeping in mind the deference we give the issuing judge's decision. Unlike Tisdale, Boner did not have a criminal record at the time he submitted the affidavit. One cannot criticize the omission of information that does not exist. Also, the events

Boner described in his affidavit were very recent, and he ap-
peared in person before the judge. While Boner did not pro-
vide a firsthand account of drug deals with Musgraves, his
affidavit provided dates and times of his trips to Musgraves's
house with Stevens. Boner's account had some possible dis-
crepancies regarding Musgraves's physical appearance and
stature, but he had identified Musgraves from a photograph.
A reasonably prudent person could find Boner's affidavit,
standing alone, sufficient to establish probable cause to search
Musgraves's house. See *United States v. Hicks*, 650 F.3d 1058,
1065 (7th Cir. 2011) (issuing judge's task is to make a "practi-
cal, common-sense decision whether … there [was] a fair
probability" that contraband would be found), quoting *Gates*,
462 U.S. at 238.

We must note, though, that if the police and state courts
were following routine practices here, those practices put
other investigations and convictions at risk. It is hard to see a
legitimate reason for the police not to inform a judge about
known facts relevant to a confidential informant's credibility.
Sergeant Brantley should have provided Tisdale's criminal
history in his affidavit, as was his responsibility. See *Glover*,
755 F.3d at 818.

Sergeant Brantley defended his practice in two troubling
ways. First, he testified it was "not a secret" to judges in the
county that Tisdale had an extensive criminal history. Yet as
Sergeant Brantley himself admitted, Tisdale was not identi-
fied by name in the affidavit, so the judge "didn't have any
opportunity to assess properly the reliability of Tisdale." Sec-
ond, Sergeant Brantley said that in his experience, neither the
judge in this case nor any other judge in Madison County, Il-

linois, had ever asked about the criminal history of an inform-ant. If that is true, that explanation is not comforting. It is hard to understand a judge not raising a question about the credi-bility of an anonymous informant whose story is offered to justify the dramatic invasion of privacy that occurs in a police search of a home.

It is the "primary responsibility" of the judge to determine probable cause. *Glover*, 755 F.3d at 818. If "affiants repeatedly provide the minimum of information," we would expect judges to demand more. *Id.* The credibility of an informant is bolstered when he appears before the judge precisely because he opens himself up to questioning. We have no reason to credit such appearances if they are no more than pro forma affirmances of affidavits. If the hearing consists merely of a judge asking affiants to swear that the information in their af-fidavits is true, the process would devolve into a useless feed-back loop: officers omit credibility information because judges never ask for it, and judges never ask about credibility information that is never presented to them.

Notwithstanding these flaws, we agree with the district court that there was enough to find probable cause for this search warrant because the Boner information was recent and specific, because he appeared before the judge, and because there was no damning information about Boner's credibility for the police to omit. Accordingly, we affirm the denial of the motion to suppress, which effectively defeats Musgraves's challenge to his Count 3 conviction for possession of ammu-nition as a felon.[1]

---

[1] Musgraves also briefly argues that he was entitled to a *Franks* hear-ing to test the evidence omitted from the affidavits. In *Franks v. Delaware*,

II. *Sufficiency of Evidence for Conspiracy, Possession of Firearm, and Drug Distribution*

With the challenge to the warrant settled, we turn now to the charges arising from Musgraves's second arrest, which occurred in November 2013. He argues that the government failed to offer sufficient evidence to convict him of conspiracy to distribute cocaine (Count 2 of the Indictment), being a felon in possession of a firearm (Count 4), and cocaine distribution (Count 5). At trial, Musgraves moved for judgment of acquittal at the close of evidence, and the district court denied the motion. Musgraves appeals the denial as to all three counts.[2]

We may reverse for insufficient evidence only if no rational jury could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Bloch*, 718 F.3d 638, 641–42 (7th Cir. 2013), quoting *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). On these three charges, Musgraves has met that high standard. The government

---

438 U.S. 154 (1978), the Supreme Court held that a search warrant is invalid if officers intentionally or recklessly provided the court with false information necessary to the probable cause determination. *United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013). We find no error on this point. The omitted information about Tisdale's criminal background would not have undermined probable cause because of (a) the more important role of the recent information from Boner, and (b) the video recording that corroborated Tisdale's account of the controlled buy back in 2012.

[2] Musgraves also argues at length that his statements to officers on November 17, 2013 should be suppressed, either as part of a valid proffer agreement based on the July 12 conversation or as involuntary, coerced statements. Because we determine that Musgraves prevails on his sufficiency of the evidence motion on appeal even with the November 17 statements in evidence, we need not decide whether those statements should be suppressed.

proved the existence of a simple buyer-seller relationship between Musgraves and Stevens but not a drug distribution conspiracy. The firearm possession and cocaine distribution convictions both depended on conjecture, which cannot support proof beyond a reasonable doubt.

A.  *Conspiracy to Distribute Cocaine (Count 2)*

Musgraves was convicted of conspiring with Romell Stevens to distribute cocaine from February 2013 until Musgraves's first arrest in July 2013. To prove a conspiracy, the government must demonstrate that the defendant knowingly and intentionally joined in an agreement with at least one other person to distribute drugs. *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015), citing *Johnson*, 592 F.3d at 754.

The problem here is that, without more, a buyer and a seller in a simple drug deal are not engaged in a conspiracy. Rather, the government must produce evidence of "an agreement to distribute drugs that is *distinct from* evidence of the agreement to complete the underlying drug deals." *Pulgar*, 789 F.3d at 812 (emphasis in original), quoting *Johnson*, 592 F.3d at 755. Merely agreeing to exchange drugs for money or property is simply "the crux of the buyer-seller transaction" and "insufficient to prove a conspiracy." *United States v. Kincannon*, 567 F.3d 893, 897 (7th Cir. 2009), citing *United States v. Colon*, 549 F.3d 565, 567–68 (7th Cir. 2008). As we said in *United States v. Pulgar*, we actively police this distinction. 789 F.3d at 813, citing *Johnson*, 592 F.3d at 759 (vacating drug conspiracy conviction), *Colon*, 549 F.3d at 569–72 (same), *United States v. Contreras*, 249 F.3d 595, 601–02 (7th Cir. 2001) (same), *United States v. Rivera*, 273 F.3d 751, 757 (7th Cir. 2001) (same), and *United States v. Baker*, 905 F.2d 1100, 1106–07 (7th Cir. 1990) (same).

The government may prove a conspiracy by producing either evidence of an express agreement or circumstantial evidence. *Pulgar*, 789 F.3d at 813. We view circumstantial evidence as a totality, and we have provided some guidance as to the type of evidence we look for: (1) sales on credit (known as "fronting"), (2) an agreement to look for other customers, (3) the payment of a commission, (4) advice by one party to the other on business tactics, and/or (5) an agreement that each will warn the other of threats from competitors or law enforcement. *Johnson*, 592 F.3d at 755–56, citing *Colon*, 549 F.3d at 568–70.

In practice, fronting is often the best indicator of a drug conspiracy because a sale on credit aligns the objectives of both the buyer and seller to see the drugs are resold to repay the debt. *United States v. Long*, 748 F.3d 322, 326 (7th Cir. 2014) ("Both parties … share the common objective of reselling the drugs since resale is the means of closing out the credit transaction."). The government did not offer evidence of sales on credit by Musgraves to Stevens. The government relies on Stevens' testimony that when he was unable to pay cash for cocaine on one occasion, he gave Musgraves his gun instead until he had the money. That was not fronting but pawning. The gun was collateral and had value to Musgraves whether or not Stevens returned with cash from downstream drug sales. This was not a sale on consignment or credit. See, e.g., *United States v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013) (conspiracy establishment by "either a consignment arrangement, or … multiple, large-quantity purchases, on credit"); *United States v. Fuller*, 532 F.3d 656, 663 (7th Cir. 2008) (finding fronting

where a seller would consistently allow buyer to take cocaine on full or partial credit).[3]

The government argues further that Musgraves "undoubtedly knew that Stevens was not using all the cocaine for himself" due to the circumstances of their drug deals. Accordingly, the government contends that the fact that Musgraves knew the cocaine was being used for further drug sales is evidence of a conspiracy. That argument misstates the inquiry. Conspiracy must be proven whether the sales are wholesale or retail.

The other relevant factors are not sufficient here to establish a drug conspiracy. The government does not argue that Musgraves and Stevens had an agreement to look for new customers or that one paid the other a commission. To the extent the government mentions advice from one party to the other on business tactics, the point was not supported with clear evidence. The government argues that there was an agreement to warn of future threats from law enforcement: the government's closing particularly pointed to Stevens' statements to Tisdale that Musgraves "doesn't sell drugs, I don't sell drugs." This incident was offered to show that Musgraves and Stevens trusted each other and wanted to protect each other from a potential informant. But this single incident occurred in September 2012, months before the alleged conspiracy began in February 2013. Moreover, we have cautioned

---

[3] In addition, Stevens's testimony on this incident was so unclear that we do not think it can support proof beyond a reasonable doubt of a conspiracy between the two. He first testified that he received cocaine from Musgraves, "but not for that gun." He then testified Musgraves would hold the gun until Stevens "paid him back." And finally, he backtracked again: "It is getting mixed up. The AK-47, I had already paid for it."

that a "singular warning is insufficient to establish the existence of a conspiracy," especially when the person giving the warning is acting out of self-preservation. *Johnson*, 592 F.3d at 757.

The core of the government's conspiracy case is evidence showing a sense of trust between Musgraves and Stevens going beyond a normal buyer-seller relationship. As we noted in *United States v. Brown*, we have moved away from using "the level of mutual trust between the buyer and seller" as a factor in conspiracy analysis. 726 F.3d 993, 998–99 (7th Cir. 2013). Because the list of factors is not intended to be exhaustive, though, we consider the point. First, the government notes that Musgraves held Stevens' gun in his home, illegally, and despite Musgraves's protests. The government argues Musgraves would not have done this unless he and the buyer shared an unusual level of confidence and trust. But this type of behavior does not prove a conspiratorial agreement. Cf. *United States v. de Soto*, 885 F.2d 354, 367 (7th Cir. 1989) ("Courts must be especially watchful … when a conspiracy is alleged to be composed of family members … .").

The government also said in its closing argument: "Why is only Romell [Stevens] allowed to go into the house and not the buyers? If Lou [Musgraves] is running arms length business, if there is a store front counter, can't anybody come in and buy cocaine? No. Only the trusted one can." The point seems to be that screening drug customers transforms sellers and buyers into conspirators. It does not. Of course a drug dealer will screen customers. He is committing a crime and wants to sell to regulars to reduce the risk of being ensnared by an informant or undercover officer. A drug dealer's choice not to open up the doors of his home to every prospective

buyer does not show he is conspiring when he does choose to open his door. To be sure, it is a crime, and Musgraves was properly convicted on Count 1 for maintaining a drug-involved premises. But it is not a conspiracy.

As the government noted in its closing arguments, much of the evidence on the conspiracy count "mirrors the evidence on Count 1 all about drug dealing." That is precisely the problem. Conspiracy is a separate conviction than drug distribution and requires evidence of a larger conspiratorial agreement. Musgraves is entitled to judgment of acquittal on the conspiracy charged in Count 2.

B. *The November 17, 2013 Charges*

Musgraves was also convicted of being a felon in possession of a firearm and of distributing cocaine, both on or about November 17, 2013. We turn to those convictions next, focusing first on the firearm charge. We pick up the facts where we left off: in July 2013 after the search of Musgraves's house and the end of the alleged drug conspiracy. We recount the evidence in the light most favorable to the government. *United States v. Griffin*, 684 F.3d 691, 694–95 (7th Cir. 2012), citing *United States v. Garrett*, 903 F.2d 1105, 1109 (7th Cir. 1990).

1. *Musgraves's Agreement to Cooperate*

Upon his arrest for possession of ammunition in July 2013, Musgraves was taken to the Alton police station and was soon joined by his attorney. Musgraves and the police agreed informally that the police would hold off on prosecuting Musgraves, at least for a while, to give him some unspecified amount of time to help the police make cases against others.

Between July and October, Musgraves and Detective McCray stayed in contact by phone and text message. On September 17, Musgraves told McCray about a person who had an AK-47, but nothing came of that tip. On September 29, Musgraves apologized to McCray for not producing any information and promised him fruitful leads. McCray, frustrated by the lack of information, responded that the "time has come to either do something or not. … It's your decision, man. I'm not going to push you to do something and I ain't mad at you if you don't, but I gotta do what I gotta do. … You got a couple of weeks to figure it out."

On November 15, McCray went to speak with Stevens, who had agreed to a proffer as to his knowledge of criminal activity. Stevens told McCray that he had received guns from Bock in a drug sale, and that he had given the weapons in turn to Musgraves.

### 2. *Musgraves's November 17 Report*

On November 17, 2013, Musgraves texted and called McCray to report that a man parked in front of his house had a gun and cocaine in his car. Police arrived at the house and found a car with a man named Jesse Smith passed out inside. A search found crack cocaine in Smith's pocket and powder cocaine in the visor of the vehicle, but no gun.

McCray texted Musgraves back to report that drugs, but no gun, had been found in the vehicle. Musgraves insisted that there was a gun in the car. McCray obtained a warrant to search the car, which had by that time been moved to a secure parking lot. No gun was visible initially, but while moving the driver's seat forward, officers spotted a handgun. Based on

the placement of the handgun and the direction it was point-
ing, McCray believed it was more likely that the gun was
placed under the seat by someone coming in from the back
door than by Smith himself in the driver's seat. McCray later
admitted that it was theoretically possible that the weapon
had moved while the vehicle was being towed to the station,
but no other evidence supported this theory.

Smith had been charged with drug possession, but Officer
McCray continued to follow up on the case. The serial number
on the handgun showed that it was one of the guns Donald
Bock had (falsely) reported stolen. After examining the police
report for Bock's stolen weapon, McCray realized that the .40
caliber handgun was one of the two guns traded to Stevens in
exchange for drugs. Stevens confirmed to McCray that Bock
had indeed traded the weapons, including the handgun, to
him in exchange for cocaine. Bock soon recanted his story that
the weapons had been stolen. Upon Detective McCray's re-
quest, the charges against Smith were dropped. Instead, Mus-
graves himself was charged with being a felon in possession
of a firearm and distribution of cocaine, both on or about No-
vember 17, 2013.

C.  *Analysis of Felon in Possession and Drug Distribution Con-
     victions*

Musgraves challenges the convictions based on the fire-
arm and cocaine found in Smith's car on November 17. The
government's primary theory of the felon-in-possession and
cocaine distribution charges is that Musgraves planted both
items in Smith's car to prove to the police that he was helping
them. In its closing argument, the government summed up its
theory: "So what does [Musgraves] do? He plants the drugs
and gun on Jesse Smith, felon in possession. We don't have to

prove he planted the gun. We have to prove that Lou pos-
sessed the gun at some point, but he planted the gun." In the
alternative, the government implies that Musgraves's 911 calls
showed his proximity to the contraband and therefore his
constructive possession of it. Musgraves argues the prosecu-
tion's evidence is too speculative to support these theories be-
yond a reasonable doubt. We agree.

We start with the framing theory and the evidence of fram-
ing on both the firearm and cocaine convictions. First, the
government established through testimony that Bock had
given the .40 caliber handgun to Stevens to trade for cocaine,
that Bock drove Stevens to Musgraves's house with the fire-
arm, that Stevens entered with the gun, and that he left the
home with cocaine and no gun. The later July 2013 search of
Musgraves's house turned up ammunition but no firearms or
drugs, and the government does not argue that the ammuni-
tion seized fit a .40 caliber handgun. Finally, the government
presented the serial number from the gun found in Smith's car
to prove it was Bock's original handgun, the communications
between Musgraves and McCray to show Musgraves's incen-
tive to produce information, the 911 call from Musgraves to
show his personal knowledge that a firearm and cocaine were
in the car, the odd position of the handgun in the car to show
that it might have been planted, and the cocaine found in the
car's visor to bolster the planting theory. In its closing argu-
ment, the government also suggested that Musgraves "was
drunk too. … People make bad decisions when they are drunk
… ." The government argues that the sum total of this evi-
dence is sufficient proof that Musgraves framed Smith and
did so by possessing the firearm and distributing cocaine.

To prove the felon-in-possession charge, the government had to prove: (1) the defendant is a convicted felon, who (2) possessed a firearm, which (3) had traveled in or affected interstate commerce. 18 U.S.C. § 922(g)(1); *United States v. Sewell*, 780 F.3d 839, 847 (7th Cir. 2015). Musgraves argues on appeal only that he did not possess the firearm. Possession may be either actual or constructive. *Sewell*, 780 F.3d at 847, citing *United States v. Villasenor*, 664 F.3d 673, 681 (7th Cir. 2011). The government relies on both actual and constructive theories of possession, but the framing theory boils down to an argument for actual possession: that on November 17, Musgraves personally placed the weapon in Smith's vehicle.

A defendant has actual possession of a firearm when he knowingly maintains immediate physical control of a firearm. *United States v. Hampton*, 585 F.3d 1033, 1040 (7th Cir. 2009), quoting *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006). This is usually proven by witness testimony placing the firearm directly in the defendant's hands, *United States v. Matthews*, 520 F.3d 806, 809 (7th Cir. 2008), or on the defendant's person, *Hampton*, 585 F.3d at 1041 (gun seen in defendant's hands and placed in his waistband).

Only one piece of evidence points directly to Musgraves's actual possession of the firearm: Stevens' testimony that he left the gun with Musgraves in exchange for cocaine. For purposes of this appeal, we must accept Stevens' account as true despite his incentive and proclivity for dishonesty. And we must therefore assume that Musgraves possessed the Bock-Smith firearm eight months before the charged offense. The key point is that that was at least eight months before the date

of the felon-in-possession charge, November 17, 2013.[4] And, critically, no firearm was found in the July 2013 search of Musgraves's home.

The government points out correctly that it can prove its case by showing that a felon held a firearm for only a moment. *United States v. Lane*, 267 F.3d 715, 718–19 (7th Cir. 2001) (brief holding and inspection of firearm established possession). The problem is that the government seeks to prove that Musgraves possessed the firearm on or about November 17, 2013, on the basis of testimony that he received it no later than March 2013, and despite the intervening search in July 2013 revealing no firearm. Even viewing the evidence in the light most favorable to the government, possession no later than March 2013 cannot support a conviction for a charge of possession on or about November 17, 2013. As we explained in *United States v. Ross*, 412 F.3d 771, 774 (7th Cir. 2005), "on or about" language in an indictment means that proof of the exact date of offense is not required, but the government must prove the crime was committed at a time "reasonably near that named in the indictment." In *Ross*, we reversed a conviction and ordered a new trial where the jury instructions would have allowed conviction for actual possession four years before the charged "on or about" date. *Id.* at 774–75, citing *United States v. Hinton*, 222 F.3d 664, 672–73 (9th Cir. 2000) (while a few weeks of variance is allowable, seven months of variance "between the facts proved and the dates alleged in the indictment" is "prejudicial"); *United States v. Casterline*, 103 F.3d 76, 77–78 (9th Cir. 1996) (firearm possession seven

---

[4] Bock did not provide an exact date of the Stevens-Musgraves trade of the handgun. But Bock reported the guns stolen on March 12, 2013, so the dealing took place sometime in the months before that date.

months earlier insufficient to establish felon-in-possession conviction reasonably near indictment date); cf. *United States v. Blanchard*, 542 F.3d 1133, 1143 (7th Cir. 2008), citing *United States v. Leibowitz*, 857 F.2d 373, 379 (7th Cir. 1988) (variances of one to three weeks were permissible).

We must also grant the government that Musgraves had a motive to try to frame Smith to get the police off of his own back. And we must assume that Musgraves had an opportunity to plant the firearm and the cocaine in Smith's car. But motive and opportunity alone are not enough to find guilt beyond a reasonable doubt. See *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999) (accused could present evidence of third-party guilt to raise reasonable doubt about his own guilt, but third party's motive or opportunity are not enough to be admissible). We concede that it's possible that Musgraves framed Smith, meaning that he would have possessed the firearm and distributed the powder cocaine on or about November 17, but the evidence falls short of proof beyond a reasonable doubt.

The government also argues that Musgraves constructively possessed the firearm, presumably by virtue of his being near Smith's vehicle on November 17. A defendant constructively possesses contraband when "he knowingly has the power and intention at a given time to exercise dominion and control over the object." *United States v. Kelly*, 519 F.3d 355, 361 (7th Cir. 2008). As relevant here, the government must demonstrate a substantial connection both between the defendant and the location as well as between the defendant and the contraband itself, *United States v. Griffin*, 684 F.3d 691, 696–97 (7th Cir. 2012), and therefore prove that Musgraves was more than a mere bystander. *United States v. Lawrence*, 788 F.3d 234, 240 (7th Cir. 2015), citing *Griffin*, 684 F.3d at 695.

The government did not present evidence establishing a substantial connection between Musgraves and Smith's car. The facts here differ from the joint occupancy cases cited by the government, where a connection between the defendant and the contraband's location is a given. The only evidence of proximity is the series of 911 calls from Musgraves indicating that he had seen Smith with the contraband nearby No witnesses were able to place Musgraves in proximity to the car and therefore the contraband, and apart from the government's framing theory, there is no evidence supporting an inference that Musgraves had the power and intention to exercise control over the firearm in Smith's car. We therefore reverse the felon-in-possession conviction under Count 4 of the indictment.

For essentially the same reasons, we also reverse Musgraves's conviction on Count 5 for distributing cocaine on or about November 17, 2013. The government's theory and evidence on this charge tracked Count 4 and relied on the theory that Musgraves tried to frame Smith by planting both the cocaine and the firearm in Smith's car. The evidence on the drug charge was a little weaker since there was no evidence tying Musgraves to the cocaine package at any time, unlike the firearm, which we must assume he possessed at least eight months before the charged offense. The cocaine package in the visor was never tested for fingerprints or DNA evidence that might have connected it to Musgraves. Musgraves is entitled to a judgment of acquittal on the drug distribution charge in Count 5 of the Indictment.

III. *Musgraves's Career Offender Status*

We turn finally to Musgraves's objection to his sentencing as a career offender under the Sentencing Guidelines. The district court determined that he qualified as a career offender despite some uncertainty as to the exact nature of one of his predicate prior offenses. Musgraves appeals that determination. Because we are reversing three of his five convictions, he must be resentenced on the remaining two. The guideline finding may well affect that decision.

The dispute focuses on a 2006 conviction in Illinois state court for unlawful possession of a controlled substance with intent to distribute. Musgraves pled guilty to unlawfully possessing a controlled substance with intent to deliver, which is considered a Class X felony in Illinois. Both sides agree that there are discrepancies in the records of the 2006 conviction. Illinois law requires a minimum nine-year sentence for this Class X felony. 720 Ill. Comp. Stat. 570/401(a)(2)(B). And yet the state court gave Musgraves a sentence of 25 months. Neither party was able to explain the reason for the mismatch, but each offered some speculation.

Musgraves argued that the best explanation for the discrepancy was that the state court judge reduced the charge to a mere possession offense but never recorded this in court documents. Simple possession without intent to distribute would not have been a drug trafficking conviction and would not have counted toward the career offender finding. The government suggested two other scenarios: first, that the state judge imposed an erroneous sentence by failing to give mandatory minimum nine-year sentence, and second that the state judge reduced the charge to possession with intent to distribute a quantity of less than one gram of cocaine, which

would make the sentence legal for a Class 2 felony. The district judge determined that either pathway reached the same result: the 2006 offense was a drug trafficking conviction with more than a year's imprisonment and thus a predicate conviction for career offender status.

We review *de novo* "whether a prior conviction qualifies as a predicate conviction for purposes of applying the career offender enhancement." *United States v. Womack*, 610 F.3d 427, 430 (7th Cir. 2010), citing *United States v. Woods*, 576 F.3d 400, 408 (7th Cir. 2009). We find no error on the part of the district judge. The district court relied here on solid evidence that Musgraves pled guilty to a predicate controlled substance offense. The parties then offered three speculative explanations for the sentencing discrepancy, but no evidence that would solve that mystery. Neither party contends, however, that the plea agreement stating the crime of conviction was inaccurate. The agreement was neither speculative nor disputed. The district court thus had before it clear evidence that Musgraves had pled guilty to and been adjudged guilty of an offense that qualifies as a predicate "controlled substance offense," a drug trafficking felony punishable by a prison term exceeding one year. See U.S.S.G. § 4B1.2(b). The judge did better to rely on that information than to ignore it.

Musgraves also contends his right to due process was violated when the district judge considered inaccurate information—either the label of the crime or the sentence given. See *United States v. Coonce*, 961 F.2d 1268, 1275 (7th Cir. 1992). But on that theory the burden was on Musgraves to "demonstrate that the information before the court was inaccurate and that the court relied on it." *Id.*, citing *United States v. Musa*, 946 F.2d 1297, 1306 (7th Cir. 1991). He has not done so. The

district court properly sentenced Musgraves as a career of-
fender on the record before it.

To sum up, Musgraves was indicted and convicted on five
counts. We AFFIRM the denial of the motion to suppress the
evidence obtained in the July 2013 search of Musgraves's
apartment, which means we affirm his convictions on Counts
1 and 3. We REVERSE the convictions on Count 2 (drug-dis-
tribution conspiracy), Count 4 (felon in possession of a fire-
arm), and Count 5 (cocaine distribution) for insufficient evi-
dence. We VACATE his sentence and REMAND this case to
the district court for resentencing on Counts 1 and 3 con-
sistent with this opinion.