In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 07-1052 & 07-1267

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONALD A. ARTHUR and MARY K. ARTHUR,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 122—**Lynn Adelman**, *Judge.*

ARGUED MAY 26, 2009—DECIDED SEPTEMBER 17, 2009

Before EASTERBROOK, *Chief Judge*, and BAUER and
POSNER, *Circuit Judges*.

BAUER, *Circuit Judge*. Ronald Arthur ("Ronald") filed a
Chapter 7 bankruptcy petition to discharge various
debts incurred over a period of time. Ronald claimed to
have few assets to satisfy the various claims. The fact was,
however, he had transferred, prior to the proceeding,
assets not listed in the petition to his wife Mary Arthur
("Mary"). More assets were transferred to Mary after

the petition had been filed. The matters were presented to a grand jury, which charged both Ronald and Mary with various counts of bankruptcy fraud and money laundering. After a bench trial, the district court found that the couple conspired to conceal Ronald's assets from both the trustee and the bankruptcy's creditors, in an attempt to have all of his debt discharged while retaining the money.

Ronald attacks all aspects of his convictions and sentence, claiming constitutional violations and various district court trial errors. Mary challenges the sufficiency of the evidence as to her convictions. We affirm.

## I. BACKGROUND

After Barbara Doyle obtained a judgment for $125,000 against Ronald based on damages to her property by loggers affiliated with Ronald, he filed a Chapter 7 bankruptcy petition and accompanying schedules to discharge the debt in the United States Bankruptcy Court for the Eastern District of Virginia. The proceedings were later transferred to the Eastern District of Wisconsin.

In the course of these proceedings, it became apparent to the trustee that Ronald had more assets than he had disclosed in his petition; that he had transferred virtually all of his income and assets to his wife Mary through various marital property agreements. And several of his entities, such as the Xtant Foundation, had received considerable earnings that had not been disclosed in his petition. (Mary served as a director of Xtant, a business that purportedly sold recycled paper.)

Mary, with the help of her husband, filed a claim for $650,000 against Ronald's bankruptcy estate. This claim was filed as a stipulation, signed by Ronald and Mary, acknowledging that Ronald was indeed indebted to Mary for her various managerial, charitable and legal services.

The bankruptcy trustee, suspicious of the couple's transfers, filed an adversary action against Ronald. Ultimately, Ronald agreed to waive the discharge of Doyle's judgment and settled the trustee's action for $25,000. This, in the couple's view, put the matter to rest.

The circumstances of the bankruptcy proceeding, however, had not gone unnoticed. A grand jury indicted Ronald on 26 counts of bankruptcy fraud and money laundering conspiracies, as well as various substantive fraud and money laundering offenses based on his and Mary's efforts to conceal his assets from the bankruptcy trustee and his creditors; Mary was charged on eleven of these counts. Ronald and Mary each agreed to waive their right to a jury trial.

During the trial, the couple mounted a joint defense, claiming that the transfers of the assets were legitimate and not an effort to hide assets. According to the couple, Ronald transferred his interests in most individually and jointly owned assets, as well as after-acquired assets and income, to Mary pursuant to a marital agreement executed on January 2, 1995, and subsequent agreements executed on August 1, 1995, and January 2, 1997.

The district court, in a 48-page "Findings of Fact and Verdict" order, found that Ronald had utilized the bank-

ruptcy system in an attempt to discharge the Doyle judgment and foil other creditors. The court found that, with the assistance of his wife Mary, Ronald created and used "phony" entities, as well as "sham[ ]" marital agreements, to hide his assets and income from the trustee, Doyle, and his other creditors, and repeatedly lied during the course of the bankruptcy proceeding. The court found that the couple had deposited funds, which should have been disclosed in the bankruptcy petition, into the bank accounts of the corporations; deposited assets into Mary's personal accounts; used the entities, such as Xtant, to conceal assets; and engaged in other unusual financial moves in an effort to conceal assets. Also, the court found that Mary inflated Ronald's liabilities by filing a false claim.

Specifically, the court found Mary guilty of bankruptcy fraud—receiving debtor property illegally and filing a false claim. This finding was based on: (1) Mary's deposit of a check, issued by a Thompson Consulting Ltd. to Ronald for work previously rendered, into their firm's business account titled "Arthur & Arthur"; (2) the purchase of a SEA DOO, a personal watercraft, for personal use with a Xtant check; and (3) Mary's deposit of a check, representing the proceeds of Ronald's interest in another business, G & K Investment, into her own bank account.

The money laundering convictions were based on the transfer of Ronald's assets and the proceeds of the bankruptcy fraud into the bank accounts of the "dummy corporations", and Mary's personal accounts, to hide Ronald's income.

The district court found Ronald guilty of 23 of the 26 counts, and sentenced him to 54 months' imprisonment. As part of this sentence, the district court applied several enhancements; one enhancement was a ten-base offense level increase under U.S.S.G. § 2B1.1(b)(1)(F) based on Ronald's attempt to discharge the $125,000 Doyle judgment.

The court found Mary guilty of nine counts of the eleven charged and sentenced her to twelve months and one-day of imprisonment.

The district court then ordered Ronald and Mary to forfeit the assets listed in the indictment, as well as a personal money judgment in an amount equal to the total of the laundered funds. The judgment against Ronald totaled $87,395.93; Mary's judgment totaled $40,806.49.

The Arthurs appealed.

## II. DISCUSSION

Ronald and Mary each raise issues distinct to their own appeal. Mary argues that the evidence presented to the district court was insufficient to convict her of conspiracy to commit money laundering, money laundering, receipt of debtor property and filing a false claim in the bankruptcy proceeding. Ronald argues that a variety of constitutional, trial, and sentencing errors were committed by the district court. The appeals have been consolidated, and we begin with Mary's appeal.

### A.  Mary Arthur

Mary faces a "nearly insurmountable hurdle" in challenging the sufficiency of the evidence to sustain her convictions. *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009) (citation omitted). We must be convinced that even "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found [her] guilty beyond a reasonable doubt." *Id*. "[W]e will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable [trier of fact] could find guilt beyond a reasonable doubt." *United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009) (citation omitted). In this inquiry, we do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations. *Id*.

Anent Mary's bankruptcy fraud convictions, she argues that the evidence against her as to the receipt of debtor property lacked sufficiency. The indictment charged Mary with five counts of receipt of debtor property, all in violation of 18 U.S.C. § 152(5). The district court found her guilty on three of these counts, relating to: (1) her deposit of a Thompson Consulting check (representing an account receivable for work previously rendered by Ronald) into the bank account of Arthur & Arthur; (2) the purchase of a SEA DOO with a check from the Arthurs' foundation Xtant; and (3) her deposit of the G & K check into her bank account. The district court found that in these three instances, assets, which should have been included in Ronald's estate and subject to creditors' claims, were intentionally removed and concealed from the bankruptcy trustee and creditors.

For these convictions to stand, the evidence must be such that a rational trier of fact could have found beyond a reasonable doubt that: (1) Mary received a material amount of property from Ronald after the filing of Ronald's bankruptcy case; (2) Mary received such property with the intent to defeat the provisions of Title 11; and (3) Mary received this property knowingly and fraudulently. *See* 18 U.S.C. § 152(5). Mary argues that the evidence presented by the government did not prove these elements beyond a reasonable doubt. Specifically, Mary argues that the assets received were legitimately hers and not Ronald's, pursuant to martial agreements entered into by the couple, which directed the distribution of the couple's assets from Ronald to Mary. In her view, she simply deposited checks that were hers under the agreements, and so could not have had the requisite mental state required for the convictions.

The district court found that the marital agreements were a sham—essentially efforts to divest Ronald of his interests in the assets to avoid creditors. The court determined that, although some marital agreements may be valid, these bore many "badges of fraud." The agreements did not surface until after the bankruptcy proceeding had been initiated. When the trustee demanded that Ronald reveal documents related to the transfer of his assets to Mary within four years of the bankruptcy filing, the first agreement was tendered, indicating that it had been entered into five years before. Although the agreement had purportedly been entered into five years before the bankruptcy filing, Ronald had not transferred any real property to Mary until the Doyle judgment

had been entered against him, three years before the filing. So, in fact, nothing was transferred pursuant to the agreements until a state court ordered Ronald to pay Doyle $125,000. Although this agreement, and others, were ultimately produced at the bankruptcy proceeding, they were never publicly filed until roughly a year after Ronald filed his bankruptcy proceeding, around the time when the couple's relationship was claimed to have soured, evidenced by a filing of a legal separation petition. In fact, the couple still lived together after the "legal separation." Moreover, funds that Mary claims were legitimately hers were never given to her, but deposited into bank accounts, accessible to Ronald. And, Ronald and Mary's tax returns did not reflect any of the transfers from Ronald to Mary, or that Ronald's income belonged to Mary. This is more than enough evidence to support a factual finding that the agreements were entered into fraudulently.

Finding the marital agreements fraudulent, the facts are sufficient to establish that Mary received Ronald's assets with an intent to defeat the bankruptcy code. For example, the SEA DOO was purchased by a check drawn on Xtant's account and titled in the name of the foundation. The district court found that Xtant had no legitimate business reason for a personal watercraft since recreational use of the vehicle does not comport with selling recycled paper. Although Mary testified that, by buying the watercraft, she was merely "taking back" money that she had loaned to Xtant, there was no evidence of a personal loan to the foundation. The district court noted that the evidence proved that Xtant

was a shell corporation used by the couple to conceal income and assets, and to pay personal expenses. Viewing these facts in the light most favorable to the government, there was enough evidence to lead a rational trier of fact to find that Mary intentionally received the property fraudulently.

Next, she challenges the sufficiency of the evidence that led to her conviction for filing a false claim against Ronald's bankruptcy estate. Under 18 U.S.C. § 152(4), the government had to prove beyond a reasonable doubt that Mary personally, or by an agent, knowingly and fraudulently presented a false claim against her husband's estate in his Title 11 bankruptcy proceeding.

Mary filed a claim for $650,000 in her husband's bankruptcy for managerial, charitable and legal work previously performed. Despite the fact that the claim was stipulated to and signed by Ronald and Mary, the district court rejected this take-our-word-for-it document. It found that she had been employed on a full-time basis as a nursing home administrator from 1997 to 2004, and "it is incredible that she was also performing legal work for her husband worth hundreds of thousands of dollars during this time." It is reasonable to conclude that the sheer amount of work-hours claimed could not have been amassed while working full time for another organization. This alone is enough for a rational trier of fact to find her guilty of filing a false claim.

Lastly, at least for Mary's appeal, Mary challenges the sufficiency of the evidence that she laundered money and conspired to launder money.

To sustain Mary's convictions for money laundering, we must determine that a rational trier of fact could have concluded from the record that Mary knowingly used the proceeds from a specified unlawful activity in financial transactions that were intended to promote the continuation of the unlawful activity, or were designed to conceal or disguise the proceeds of the unlawful activity. *See United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005) (citation omitted)*; see also* 18 U.S.C. § 1956(a)(1). For the conspiracy conviction, our inquiry is to whether the district court could have concluded from the record that Mary "was knowingly involved with two or more people for the purposes of money laundering and that [she] knew the proceeds used to further the scheme were derived from an illegal activity." *Turner*, 400 F.3d at 496 (citation omitted); 18 U.S.C. § 1956(h).

The district court convicted Mary of one count of conspiracy to launder money and three counts of money laundering. For the three substantive counts, the district court convicted Mary based on the bankruptcy fraud convictions for the receipt of debtor property in which we found the evidence sufficient. In other words, the district court found that these unlawful specified activities generated proceeds that Mary subsequently laundered.

Mary argues that the evidence was insufficient to establish any proceeds generated from the unlawful activity, and that, even assuming we find that proceeds were so generated, Mary did not use them to perpetu-

ate the specified unlawful activity. She correctly states that the bankruptcy fraud offenses must have produced proceeds that were subsequently laundered and that these offenses "must have produced proceeds in acts distinct from the conduct that constitutes money laundering." *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). The record shows that Mary deposited the Thompson Consulting check, issued to Ronald, into the Arthur & Arthur bank account, over which she had sole signature authority. As mentioned before, the $3,350 check represented an account receivable due to Ronald for work he performed prior to his bankruptcy filing. This amount should have been disclosed to the bankruptcy trustee. Mary deposited the check, but her involvement consisted of much more than a simple bank visit. Thompson Consulting's David Welnetz testified that although Ronald had performed the work, Mary delivered the invoice. This is enough to conclude that Mary was aware that Ronald, and not she, had the account receivable coming. The assets were omitted from Ronald's bankruptcy petition. While it was Ronald's petition that started the proceeding, there is evidence that Mary was aware of it and its requisite disclosures; she and Ronald had prepared a stipulation that Ronald had owed her money. A rational trier of fact could conclude that by depositing the check, the couple promoted the ongoing concealment of assets.

For similar reasons, there is enough evidence in the record to sustain Mary's convictions as to her deposit of the G & K Investment check. Ronald initially sought to have G & K make the check for $27,954 payable to

Mary, but G & K refused. Although Ronald claimed in his bankruptcy proceeding that two previous G & K checks were lost, he signed the third one over to Mary, roughly six months after it had been issued, and certainly after Ronald filed his bankruptcy petition. This was an asset that Ronald omitted from his bankruptcy petition and schedules. And like the Thompson check, the G & K check was taken out of Ronald's estate, and, this time, deposited into Mary's account. In short, Mary engaged in financial transactions that shielded assets from the trustee and Ronald's creditors in his bankruptcy proceeding.

The district court was aware that "the mere spending of ill-gotten funds" would not sweep the bankruptcy fraud conduct within the money laundering statute, and that subsequent transactions must be designed to hide the provenance of the funds. Based on the proven facts, there was no error in viewing these events as efforts to conceal or disguise the proceeds, or promote the carrying on, of the bankruptcy fraud. Mary's convictions stand. And because the forfeiture order entered against her was based on these convictions, it also stands.

### B.  Ronald Arthur

Ronald claims that his prosecution for concealing assets violated his constitutional rights since he believed in the validity of the marital agreements. He also argues that the indictment charging him in various counts was improper. He then argues that the district court erred in denying his motion to substitute attorneys, and in the sentence imposed.

Ronald claims that he did not disclose assets from his estate in his bankruptcy petition and schedules because they were distributed pursuant to marital agreements, and therefore, he cannot be found guilty for making false oaths or accounts under 18 U.S.C. § 152(2). Ronald argues that the district court violated his constitutional rights by an overly broad reading of the statute and interpreting it to include a mandatory disclosure of the purportedly legally distributed assets in his bankruptcy petition. He also claims that the statute contains ambiguous terms that welcomed the district court's overbroad interpretation.

We disagree. Briefly, the statute is not overbroad; it simply has a broad scope. *See United States v. Ellis*, 50 F.3d 419, 422-23 (7th Cir. 1995) (citation omitted) ("Section 152 is a congressional attempt to cover all the possible methods by which a debtor or any other person may attempt to defeat the intent and effect of the bankruptcy law through any type of effort to keep assets from being equitably distributed among the creditors."). Ronald was required to disclose the assets that he concealed, including the assets still due to him at the time he filed that were ultimately delivered to his wife. *See In re Carlson*, 263 F.3d 748, 750 (7th Cir. 2001). And as for his non-disclosure justification, the district court's factual finding that the marital agreements were fraudulent was well-founded.

Next, Ronald claims "structural error" by the district court when it denied his motions for a mistrial based on his wife's purported ineffective counsel and for

refusing him counsel of his choice, coercing him to appear pro se. We review these decisions for an abuse of discretion. *See United States v. Taylor*, 569 F.3d 742, 746 (7th Cir. 2009); *see also United States v. Irorere*, 228 F.3d 816, 827 (7th Cir. 2000). At trial, Mary's counsel admitted that he had fallen asleep, but the district court concluded that since there had been very little mention of Mary at that point, she was not prejudiced. The district court further gave Mary the option of how to proceed in her case: remaining with her counsel, dual representation by Ronald's counsel or, proceeding pro se. Mary elected to remain with her attorney and the district court noted that he had adequately performed to date.

Initially, Ronald has no standing to raise a Sixth Amendment ineffective assistance of counsel claim on behalf of his wife. *See United States v. Recendiz*, 557 F.3d 511, 522 (7th Cir. 2009). In fact, Mary had no qualms with her representation and she did not appeal on the issue. Second, Ronald elected to appear pro se after the court determined that "[h]e has a conflict-free lawyer who is able to competently represent him." The district court found that Ronald continuously delayed the trial by toying with this subject throughout the litigation. *See United States v. Murphy*, 469 F.3d 1130, 1135 (7th Cir. 2006) (internal quotations and citation omitted) ("a defendant may not use [the Sixth Amendment right to counsel] to play a cat and mouse game with the court, or by ruse or stratagem fraudulently seek to have the trial judge placed in a position where . . . the judge appears to be arbitrarily depriving the defendant of counsel."). He waited almost a year after his verdict had been

entered to request new counsel for sentencing purposes and did not justify his delay to the district court. Although he was without counsel during his sentencing hearing, his previous counsel remained as "stand-by" counsel. More importantly, it was his choice. *See United States v. Fazzini*, 871 F.2d 635, 642 (7th Cir. 1989).

Finally, Ronald asserts that the district court erred when it used a prior $125,000 state court judgment against Ronald to increase his base offense level under U.S.S.G. § 2B1.1(b)(1)(F). He argues that, although the proper measure of "intended loss" in a bankruptcy fraud case is the amount of debt that a defendant seeks to discharge, the prior judgment could never have been discharged. However, had Ronald's bankruptcy proceeding sailed smoothly, the judgment would have indeed been wiped out. "Intended loss" is the "harm that was intended to result from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). It matters not that Ronald ultimately waived the discharge of the judgment since, admittedly, his intent was to rid himself of the debt. Moreover, even if as Ronald argues, the judgment was, at least in part, non-dischargeable, "intended loss" also includes "harm that would have been impossible or unlikely to occur." *Id*.

## III. CONCLUSION

For the reasons set forth above, the convictions and sentences of Ronald and Mary stand. We AFFIRM.